Filed 1/13/14  In re I.A. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re I.A. et al., Persons Coming Under the Juvenile Court Law. | B249416 (Los Angeles County Super. Ct. No. CK85786) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.A.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mark Borenstein, Judge.  Affirmed.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and William D. Thetford, Deputy County Counsel for Plaintiff and Respondent.

I. INTRODUCTION

The mother, S.A., appeals from orders terminating her parental rights as to her sons, I.A. and C.A. The mother argues the order in I.A.'s case must be reversed because the Indian Child Welfare Act notices were defective. The mother also contends she and I.A.'s father were not given proper notice of the Welfare and Institutions Code section 366.26 hearing.[1] In addition, the mother asserts the juvenile court erred in finding the sibling relationship exception was inapplicable as to I.A. Finally, the mother challenges the juvenile court's adoptability findings for I.A. and C.A. We affirm the parental termination orders as to both I.A. and C.A.

## II. PROCEDURAL HISTORY

On December 16, 2010, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of eight-year old I.A. The petition alleges: the mother physically abused I.A. by hitting him with a belt; the mother had mental and emotional problems; and the father, D.T., failed to provide I.A. with the necessities of life. At the December 16, 2010 detention hearing, I.A. was detained and placed in foster care. The juvenile court ordered the department to provide notice to the Cherokee tribes, the Bureau of Indian Affairs, and the Secretary of the Interior. D.T. was found to be I.A.'s alleged father.

On March 7, 2011, the mother filed a waiver of her trial rights. The juvenile court amended and sustained the petition as to the mother under section 300, subdivision (b): "The [mother] has mental and emotional problems, including a diagnosis of Bipolar Disorder, which renders the mother incapable of providing regular care of the child. On or about 12/03/2010, the mother was hospitalized for the evaluation and treatment of the

---

[1] Future statutory references are to the Welfare and Institutions Code.

mother's psychiatric condition. On 12/03/2010 and 12/11/2010, the mother threatened to kill herself, the child, and the Maternal Grandmother. Such mental and emotional condition on the part of the mother endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage."

On March 23, 2011, the juvenile court made disposition orders as to the mother. I.A. was removed from the mother's custody. The mother was granted family reunification services and monitored visits. The juvenile court ordered the mother to participate in individual and psychiatric counseling and to take all prescribed psychotropic medication.

On April 22, 2011, I.A.'s father, D.T., appeared in the juvenile court for the first time and was appointed counsel. The father filed a Notice of Indian Status indicating he had Cherokee Indian heritage through the paternal grandmother. D.T. was found to be I.A.'s presumed father. The juvenile court amended and sustained the petition as to the father under section 300, subdivision (g). At the May 6, 2011 disposition hearing as to D.T., the juvenile court ordered notice to be given to the Cherokee tribes, Indian affairs bureau and the interior secretary. D.T. was granted unmonitored visits and ordered to participate in counseling. At the June 22, 2011 progress hearing for I.A., D.T.'s counsel requested a paternity test, which was denied.

On September 30, 2011, the department filed a petition on behalf of C.A., who was born in June 2011. At C.A.'s detention hearing, the juvenile court found the Indian Child Welfare Act was inapplicable. The juvenile court found S.D. was C.A.'s biological father pending the paternity test results. C.A. was detained from the mother and placed with I.A.'s paternal aunt, D.L.

On February 2, 2012, the department filed a second amended petition on behalf of C.A. At the February 2, 2012 hearing, the parents submitted waivers of their trial rights. The juvenile court amended and sustained the second amended petition under section 300, subdivision (b). The juvenile court found the parents had drug abuse and mental and emotional problems. The father, S.D., suffered from: drug induced paranoid schizophrenia; post-traumatic stress disorder; and bipolar disorder. S.D. had an

3

unresolved history of substance abuse and currently abused marijuana and alcohol. In addition, the mother had a history of drug abuse and was a current abuser of marijuana, methamphetamine and alcohol. The parents were granted monitored visits. They were ordered to participate in: random alcohol and drug testing; parenting classes; alcohol and drug counseling; and individual counseling.

At the May 23, 2012 section 366.21, subdivision (f) hearing for I.A., the juvenile court terminated family reunification services for the parents. The juvenile court stated: "The court finds that the [parents] have not consistently and regularly contacted and visited with the [child], that they have not made significant progress in resolving the problems that led to the [child's] removal from the home, and they have not demonstrated the capacity or ability both to complete the objectives of the treatment plan and to provide for the [child's] safety, protection, physical and emotional well-being, and special needs. The court finds that there is not a substantial probability that the [child] will be returned to the custody of the parents within the next period of review and terminates family reunification services." At the December 3, 2012 contested section 366.21, subdivision (e) hearing for C.A., the juvenile court found the parents were in partial compliance with the case plan. The juvenile court terminated family reunification services for the parents.

On January 18, 2013, the juvenile court held a section 366.26 hearing for I.A. and a progress report hearing for C.A. The juvenile court approved C.A.'s visit to his paternal grandmother's home in Maryland. The mother was granted make-up visits after C.A.'s Maryland trip. The section 366.26 hearing for C.A. was set for April 9, 2013. The juvenile court set a contested section 366.26 hearing for I.A. on March 14, 2013. The mother, S.D. and their attorneys were present at the hearing.

At the March 14, 2013 section 366.26 hearing for I.A., neither the mother nor D.T. were present. The juvenile court stated the father denied paternity of I.A. and did not want presumed status. D.T. was dismissed from the case. The juvenile court explained: "The department has confirmed that [D.T.] does not believe he is the father, and he does not wish to participate in these proceedings. I don't think he was given any status earlier.

4

He is dismissed." In addition, D.T.'s counsel was relieved as attorney of record. The juvenile court denied the mother's counsel's continuance motion. The sole basis for the continuance motion was that the mother was not present. The juvenile court denied the continuance request because the mother was present when the hearing was set. The matter was continued on March 15, 2013.

At the March 18, 2013 section 366.26 hearing for I.A., the mother was not present. But she was represented by counsel. The mother's counsel objected to termination of parental rights arguing the sibling exception applied. The juvenile court found no evidence of a substantial sibling relationship because: the siblings had not been raised in the same home; the siblings did not share significant common experiences; and there was no evidence they had a close bond. The juvenile court found I.A. was adoptable and terminated the mother's and D.T.'s parental rights.

At the April 9, 2013 section 366.26 hearing for C.A., the mother and S.D. were present and represented by counsel. The mother's counsel argued C.A. was not adoptable. This was because D.L. was unable to adopt C.A. and there was no approved home study for the paternal grandmother. In addition, the mother's counsel argued the parent-child relationship exception was applicable. This was because the mother visited C.A. on a regular, consistent basis. S.D.'s counsel, Kyle Puro, stated the father supported adoption of C.A. by the paternal grandmother. However, Mr. Puro did not think the child was adoptable by clear and convincing evidence because C.A. did not have a permanent home yet. The father's attorney, Mr. Puro, argued parental rights could not be terminated unless there was an approved home study. The juvenile court found: C.A. was adoptable by clear and convincing evidence; the paternal grandmother had an approved placement study and terminating parental rights would facilitate the paternal grandmother's adoption of C.A.; and the parent-child relationship exception was inapplicable. The juvenile court terminated parental rights and ordered C.A. placed with his paternal grandmother.

The mother filed her notice of appeal on May 10, 2013.

III.  FACTS


A.  Detention Report For I.A.


The December 16, 2010 detention report summarized several referrals received by the department.  On October 6, 2010, a reporting party called the department hotline alleging the mother was verbally abusive towards I.A.  The mother also had punched I.A. on the chest with a closed fist.  The reporting party had met with the mother for about an hour the day before.  According to the reporting party the mother "seemed a little bit off."  The mother stated she was a celebrity and there had been a breach of security.  The mother reported she has been diagnosed with bipolar, compulsive and multiple personality disorders.

Children's social worker Shamali Perera later met with the mother and I.A.  I.A. denied any abuse and did not have any marks or bruises.  The mother denied ever punching I.A.  But the mother admitted she had spanked I.A. on his butt with her hand and used a belt a few times.  She denied telling anyone she was a celebrity but stated she modeled on the side.  The mother reported she was diagnosed with bipolar disorder and obsessive compulsive disorder a month earlier.  She stated she was taking her prescribed medications.  Based on the interviews with the mother and I.A., Ms. Perera closed the referral.

On October 15, 2010, the department received another hotline referral from I.A.'s elementary school.  The reporting party stated the mother had attended a school conference the day before and appeared "crazy" with "mental issues."  According to the detention report, at the conference, the mother said:  I.A. could decide what type of parent he wanted her to be on any given day; she was a celebrity and the paparazzi were after her; and I.A. and she had their own language.  The mother also had disrupted a teacher during class.  The mother told the school counselor she has been diagnosed with bipolar disorder and had multiple personalities but was not on any medication.  The caller stated I.A. often showed up to school irritable and hungry.

6

On October 16, 2010, a social worker met with the mother and I.A. The mother denied making the comments alleged in the referral. She denied saying she and I.A. had their own language. However, she knew some sign language and Spanish words and had taught her son some words in those languages. The mother denied having multiple personalities. The child stated when he got in trouble, he received time outs.

On December 6, 2010, the mother was hospitalized at Pacific Hospital pursuant to a psychiatric hold. The mother spoke with Ms. Perera, the social worker. The mother related that she went to the hospital on her own because she was having thoughts of harming herself. While hospitalized, the mother made arrangements for I.A. to stay with maternal grandmother, G.D. The hospital intake form stated: "[The mother] stated that she's tired of life. She is very depressed, has not slept well, she is hyper-religious, singing hymns and praying. Told [emergency room staff] that God is the Father of her unborn child. States God is talking to her. Patient states she has a history of Bipolar Disorder, [Obsessive Compulsive Disorder], Anxiety Disorder, Post Traumatic Stress Disorder, raped at 15 years old and Multiple Personality. States [,] 'I'm a Boss Lady Butterfly.' Patient admits to having thoughts of harming herself [and] another person. Stated [,] 'I just thought about ending it all—Kill my 8 year old son and then kill myself.'"

On December 7, 2010, the mother was discharged from the hospital. The mother agreed to receive services because she did not want I.A. taken from her. The next day, Ms. Perera met with the mother, I.A. and G.D., the maternal grandmother. The mother stated on December 3, 2010, she felt extreme nausea and went to St. Mary's Medical Center. She was refused treatment because she had fought with a nurse the day before. She was told to go to Pacific Hospital for treatment. At Pacific Hospital, the mother told staff she felt depressed and had thoughts of "ending it all" during a two-week period in November. The mother denied she heard voices from God. She admitted she often referred to herself as "Boss Lady Butterfly," her pseudonym for herself in the entertainment business. The mother and G.D. agreed to a safety plan. They agreed I.A. would stay with G.D., until the team decisionmaking meeting.

7

On December 11, 2010, the mother called the department hotline and said, "'I did feel like killing my mother and still feel like it, but it's not as intense as it was last night.'" G.D. allegedly refused to feed or clothe I.A. without the mother. The mother took I.A. with her and was staying with some friends in Long Beach. The mother later checked herself into St. Mary Hospital. A social worker met the mother at the emergency room. The social worker observed the mother was "dressed like a little kid with a hat on that was turned backwards" and wore large basketball shorts. The mother explained she woke up feeling like a four-year-old. The mother stated she was not taking her psychotropic medications because she was three months pregnant. The mother reported her first psychosis break happened when she and her husband of 13years separated. The social worker explained in the detention report: "[The mother] blames her mother for her mental illness. [The mother] further stated[,] 'That's why I'm all fucked up.' [¶] [The mother] stated she understands she is not well and that is why she checked [herself] into the hospital so that she would not hurt her mother." G.D. disclosed the day before that the mother's biological father was mentally ill. The mother reported her biological father had raped her when she was four years old.

On December 13, 2010, children's social worker Marisa Martinez contacted G.D. Ms. Martinez related that G.D. stated I.A. had been with his mother since two days ago. G.D. was aware that the child was supposed to stay at her home. But G.D. thought I.A. could stay with the mother provided an adult was with them. G.D.'s adult daughter or son was with the mother and I.A. Because the mother failed to follow the safety plan, I.A. was detained and placed into protective custody.

B.  Jurisdiction/Disposition Report for I.A.

The January 19, 2011 jurisdiction and disposition report was prepared by children's social worker Maryanne Duffy.  I.A. stated the mother hit him about once a month but did not do so anymore.  The mother would hit him on his buttocks with her hand or a belt.  The child stated the mother had a lot of bad days.  The mother told I.A. she was thinking of killing herself and him.  The mother also threatened to stab a paternal uncle in the heart with a knife during an argument.  I.A. did not have a significant relationship with the father and they rarely saw each other.

The mother admitted she hit I.A. on his buttocks with a belt when he lied or stole.  But she stated she had not hit him in a while.  The father, D.T., had never supported or maintained contact with the child.  As for her mental illness, the mother stated she felt hopeless, suicidal and homicidal in November because her husband, M.A., had left her.  She stated:  "The therapist said I have Bipolar Disorder, Anxiety and [Obsessive Compulsive Disorder] and gave me medication.  I took the medicines for two or three weeks and noticed it made me lethargic and unable to think.  I took myself off the meds so I can think.  When I was 16 I was on antidepressants and I used those pills to try to commit suicide.  In December I was hospitalized for four days on a 5150 hold.  I was more concerned about the pregnancy.  I had thoughts of killing myself and my son and I did voice my thoughts.  I merely voiced I had thoughts.  Medicine is not gonna help me.  I gotta learn to hold it together on my own."

The mother had weekly monitored visits with I.A.  The visits were one hour and monitored by the foster parent.  During phone calls, the child reported the mother told him that he would be moving back with her.

Ms. Duffy recommended:  family reunification services for the mother; the mother participate in individual counseling and parenting classes; and the mother obtain bipolar disorder treatment from a licensed psychiatrist.  Ms. Duffy was unable to locate the alleged father, D.T.  Ms. Duffy also attached the Indian Child Welfare Act notices sent on January 12, 2011.  She sent notice of the pre-resolution conference hearing and

9

petition to: the Indian affairs bureau; the interior secretary; the Cherokee Nation of Oklahoma; the Cherokee Eastern Band of Cherokee Indians; and the Cherokee United Keetoowah Band of Cherokee Indians.

## C.  March 7, 2011 Last Minute Information for the Court

The department recommended I.A. be placed with his paternal aunt, D.L.  In addition, the department submitted tribal notice responses from the Cherokee Boys Club, Inc., and the Indian affairs bureau.  The Cherokee Boys Club, Inc., stated I.A. was not registered or eligible to register as member of the Eastern Band of Cherokee Indians.  The Indian affairs bureau stated no response was required because the department had noticed the tribes.  In addition, the department submitted certified mailing return receipts showing notices were received by:  the United Keetoowah Band of Cherokee Indians; the Cherokee Nation of Oklahoma; the Eastern Band of Cherokee Indians; the interior department; and the Indian affairs bureau.

## D.  Interim Review Reports

The April 22, 2011 interim review report indicated I.A.'s father, D.T., had been located.  Ms. Duffy interviewed D.T., on March 29, 2011.  The father stated he lived in Fontana at his mother's home.  He had been unemployed for the past three years and worked in the past as a janitor.  D.T. stated he "had a one night stand" with the mother.  The father visited I.A. once every three months but never paid child support.  In terms of a dispositional order, the father suggested, "I want my son with my sister [D.L.] so he can be in a different environment than he is in now."  If placed with D.L., he would be around other family members.  Further, Ms. Duffy wrote, "The father . . . has indicated that . . . he is not in a position to care for the child . . . at this time."

The May 6, 2011 interim review report discussed I.A.'s extended visit with his paternal aunt.  The father stayed over three nights to visit I.A.  The child played football

10

with the father and cousins.  In addition, the child visited his paternal grandmother.  I.A. felt comfortable with D.L. and liked being with the father.  The child wanted to stay with D.L. to be close to his family.  The department recommended I.A. be placed with D.L., his paternal aunt.  D.L.'s home had already been approved and the two cousins placed in her home would provide I.A. a sense of family.

The June 22, 2011 interim review report indicated I.A. was placed with D.L. on May 6, 2011.  I.A. adjusted well with the paternal aunt and got along with his cousins.  I.A. had four overnight visits with D.T.  But D.T. visited I.A. only once in June.

On June 16, 2011, children's social worker Nirmala Gupta called D.T.  Ms. Gupta's report states:  "The father stated that he has visited his son every weekend and has over night weekends every week with his son.  He stated that things were a little tense as he just informed his wife that he has another son.  He stated that there is a lot of friction in the home because of that.  He states that he would like to have a [deoxyribonucleic acid test] to know if this is really his son."  D.T. stated none of his other children reside with him and his wife.

### E.  September 21, 2011 Last Minute Information for the Court

The mother gave birth to another son, C.A., in June 2011.  On September 8, 2011, the department received a referral alleging D.T. had struck I.A. in the chest.  I.A. reported D.T. came to see a half-sister.  I.A. ran to D.T. and said, "Hi, dad" and D.T. pushed I.A. aside.  I.A. was pushed in the chest.  I.A. fell on the floor but did not have any marks.  According to social worker Sheryl Martinez, "[Social worker Nenita] Bulandus reported that [I.A.] cried because he felt sad that he was rejected by his father."

The mother heard about the incident and wanted to kill D.T. for pushing I.A.  She voluntarily admitted herself to Pacific Hospital on September 6, 2011, and was released two days later.  The mother stated she was taking medication for depression and bipolar disorder.  The mother agreed C.A. should be placed with the maternal grandmother for 30 days as part of the safety plan.  The maternal grandmother had cared for C.A. when the

11

mother was hospitalized. However, the mother later asked to reunite with C.A. The mother had resided with C.A. at Charlotte's House but could not stay there unless she lived with him. The department considered filing a non-detained petition for C.A. because the mother was taking good care of him and knew when to seek mental health treatment.

## F.  September 21, 2011 Status Review Report

The September 21, 2011 status review report indicated D.T. stopped visiting I.A. The paternal aunt reported D.T. used a home kit paternity test. The stepmother stated the test results show that her spouse is not I.A.'s biological father. According to Ms. Gupta: "The stepmother called and stated that they had done a test and results state that he is not the biological father of [I.A.]. The father has stopped visiting [I.A.] as he states that the child does not belong to him." Ms. Gupta's report states: "[The father] states that he did a home paternity test and it states that [I.A.] is not his son and therefore does not want to have anything to do with [I.A.]. His wife also called this [social worker] and stated that since he is not the father of the child that they do not want to have anything to do with [I.A.]." Ms. Gupta recommended termination of D.T.'s family reunification services and monitored visits.

According to Ms. Gupta, I.A. was doing well in his paternal aunt's home. He had fun with his cousins. He attended many family gatherings and enjoyed meeting his half siblings. The mother was visiting and attending parenting classes.

## G.  Detention Report For C.A.

The September 30, 2011 detention report indicated C.A. was cared for by the maternal grandmother. The mother visited but did not actively care for him. On September 27, 2011, the mother came to the department office and asked to speak to Ms. Gupta. Ms. Gupta wrote, "[The mother, said] she had warned the security

guard . . . that he should keep an eye on her." She was tired of waiting and wanted her children back. The mother stated she was homeless and had not bathed for days. The mother was informed she could rescind the safety plan but C.A. would be detained and the matter would be taken up by the juvenile court. In addition, C.A. would be removed from the maternal grandmother's home because the department did not have proper clearances on some family members. The mother agreed to have C.A. be placed with D.L.

### H. September 30, 2011 Last Minute Information For The Court

The mother visited C.A. at D.L.'s home for five hours on September 28, 2011, but spent most of the time on the phone. The mother heard I.A. and the other children playing and rough-housing in another room. She went into that room and yelled at I.A. in a "very harsh tone." D.L. reported I.A. appeared scared.

D.L. also stated several weeks earlier the mother visited the children. According to D.L., the mother carried a small duffel bag. The bag was filled with 15 to 20 full bottles of prescription drugs including Lithium, Serroquil and Vicodin. The mother asked if the paternal aunt knew anyone who might want to buy the drugs. The mother was told to remove the drugs from D.L.'s home.

### I. Jurisdiction/Disposition Report For C.A.

The November 2, 2011 jurisdiction and disposition report indicated the mother was homeless and living out of her vehicle. The mother was first hospitalized for mental health problems when she was 16 years old. The mother also admitted she first used marijuana at 16 and had last used the drug two weeks earlier. The mother stated: "I was feeling hopeless. I admit, I was intoxicated and high over the weekend. I left the [Shields] program last Thursday or Friday. I had a drug problem in the past. I got a job at a stripper place and I start tonight." She reported using drugs again because she felt

13

like she had nothing to lose.  The social worker, Darlene Moore, wrote:  "On [October 28, 2011, D.L.] reported [the] mother [visited] with [C.A.] and [I.A.], but stated, 'She comes when she feels like it.'  According to [D.L.], [the] mother will call and schedule a visit, but will not show up."

C.A.'s father, S.D., reported being diagnosed with drug induced paranoid schizophrenia and bipolar disorder.  He stated he was taking Abilify.  S.D. also suffered post-traumatic stress disorder after witnessing domestic violence between his parents when he was three.  S.D. reported using alcohol two weeks earlier and marijuana in September 2011.  He used drugs, including cocaine, from the age of 15 until last year.  S.D. had attended drug programs but never completed any of them.  The father was homeless and living with friends.  S.D. had visited C.A. twice since the child was born.

## J.  Status Review Report For I.A.

The April 16, 2012 status review report for I.A. stated he was doing well with D.L.  He had fun playing with his cousins and the neighbor's kids.  I.A. was happy living with C.A.  He liked getting visits from the mother.  I.A suffered depression and had auditory hallucinations so he was taking Abilify.

D.T. had not visited I.A. in a long time.  D.T. also had not kept his appointments with children's social worker Nirmala Singh.  In addition, the stepmother called Ms. Singh and stated D.T. was not I.A.'s father.

The mother visited I.A. but was inappropriate on several occasions.  One time, the mother brought a man with her to the visit and appeared intoxicated.  Another time, the mother brought a liquor bottle with her to a visit with the two boys.  The mother also made promises but did not follow through on them.  The mother called I.A. on his birthday but during the conversation she told him she would call him back later.  She did not call back until a few days later.  This made the child depressed and sad.

14

### K.  Status Report for C.A.

The August 2, 2012 status review report stated C.A. lived with I.A. in D.L.'s home.  The court-ordered study of C.A.'s paternal grandmother's Maryland home was in process.  The paternal grandmother, K.S., had completed her foster care classes.  In addition, K.S. had been in touch with C.A. and D.L. on a weekly basis through telephone and Skype.  K.S. wanted to adopt C.A.  D.L. stated C.A. should be placed with K.S. so he could be with his own family.  But D.L. would adopt the two boys if C.A. was not placed with K.S., the paternal grandmother.

The mother had been partially compliant with the juvenile court's orders.  The mother attended classes at the Tarzana Drug Treatment Center but refused to undergo narcotics testing on three separate occasions.  The mother was pregnant again but did not know who the father of the child was.  She was not taking her psychotropic medications because of her pregnancy.  The mother was visiting the children twice a month since April.  The children were transported to visit the mother.  The drive was three hours long and C.A. got very tired after the visits.  The department recommended the mother transport herself to visit the children rather than the other way around.

The mother had lived at six different drug treatment facilities.  She had to move from the various facilities because she was unable to obey their rules.  The mother also was homeless at one point and lived in her car.  In addition, the mother's family reunification services for I.A. had been terminated on May 23, 2012.

C.A.'s father, S.D., admittedly was not compliant with the juvenile court orders.  According to the social worker, "The father . . . has gone back to smoking [m]arijuana and drinking and would like his child placed with the paternal grandmother."  S.D. was visiting C.A. once a week until May 2012.  He came to the visits unkempt and hungry.  S.D. provided a written statement on July 24, 2012 to Ms. Singh, which was later provided to the juvenile court.  The written statement states:  "I'm [S.D.] the biological father to [C.A.].  At this current time it[']s my choice to sign my parental rights as a parent over to my biological mother, [K.S.]."

15

L.  Section 366.26 Report For I.A.


The March 12, 2013 interim review report for I.A. indicated the mother did not closely bond with the children during the visits.  D.L. reported:  "[The mother] comes every Saturday but I think she comes just to say she visits but it is not like a bonding visit you know.  She never picks up [I.A.] and hold[s] him.  She never touches him.  She won't do anything to help [C.A.] get potty trained and she doesn't change him.  Sometimes she goes to sleep during the visits.  Last Saturday she showed up an hour late and didn't call to let me know she'd be late.  What really upsets me is that she will tell [I.A.] that he will be coming home to her shortly and I have to correct her on that.  She brought a strange man over one Saturday in February and I told her she could not bring strangers over to my house.  So she sent him across the street where he sat in front of a church for four hours.  Then, during her visit she would go across the street and sit with the man for an hour and I had to tell her she needs to be visiting with her kids. . . ."

I.A.'s father, D.T., signed a parentage statement form on February 25, 2013.  It indicated he was not I.A.'s father.  D.T. did not want to participate in the juvenile court proceedings for I.A.  D.T. acknowledged he would not receive further notices of the juvenile court hearings.

D.L.'s home study for I.A. was approved on December 14, 2012.  However, the department recommended D.L. not care for any more children, especially youngsters because of her health.  D.L. was being treated for work-related injuries, needed future surgeries, and took prescribed medications to control chronic pain.


M.  Section 366.26 Report For C.A.


The April 9, 2013 section 366.26 report stated C.A. would likely be adopted by his paternal grandmother, K.S., if parental rights were terminated.  K.S. was a 55-year old registered nurse who lived in Maryland.  K.S. had been interested in having C.A. placed with her since he was detained.  Her home was assessed and she was found to be "very

16

energetic and family oriented" and she had a large support network of friends and family. K.S. had a room ready for C.A. with a toddler bed, appropriate decorations and toys. As noted, K.S. maintained a consistent relationship with C.A. through telephone calls and Skype. K.S. also had visited C.A. in California and sent D.L. money for him.

The Interstate Compact on the Placement of Children approval from Maryland was only for C.A.'s placement with K.S. C.A. had to be placed with K.S. before the Maryland child protective services authorities would proceed with the adoption home study. The interstate compact liaison staffer for Maryland stated the adoption home study would be quickly approved once C.A. was placed with K.S. Because the placement approval was only good for six months, parental rights needed to be terminated and C.A. placed with K.S. soon to proceed with the adoption home study.

The mother visited C.A. at D.L.'s home bringing different men to the visits. D.L. had not allowed the men in her home because none was C.A.'s father. Ms. Singh recommended termination of parental rights and adoption placement for C.A.

## IV.  DISCUSSION

### A.  Indian Child Welfare Act Notice

The mother argues she is entitled to a new section 366.26 hearing for I.A. because the Indian Child Welfare Act notices were defective. The mother concedes the social worker sent out notices to the Cherokee tribes on January 12, 2011. But the mother contends the notices were incomplete and defective because they were done before D.T. appeared in court. She also argues the order terminating parental rights must be reversed because the juvenile court never made any findings concerning notice under the Indian Child Welfare Act. The mother's arguments are meritless.

The department sent notices on January 12, 2011 to the:  Cherokee Nation of Oklahoma; the Eastern Band of Cherokee Indians; the United Keetoowah Band of Cherokee Indians; the Indian affairs bureau; and the interior secretary. The notices

17

identified the names and dates of birth of the parents and the names of the maternal grandparents and the paternal grandmother.  On March 7, 2011, the department submitted evidence that the Indian tribes and the government agencies received the notices.  The department filed certified mail return receipts for:  the Keetoowah Band of Cherokee Indians; the Cherokee Nation of Oklahoma; the Eastern Band of Cherokee Indians; the interior secretary; and the Indian affairs bureau.  The Cherokee Boys Club, Inc., sent a February 3, 2011 letter stating I.A. was not registered or eligible to register as a member of the Eastern Band of Cherokee Indians.  In a January 24, 2011 letter, the Indian affairs bureau stated no response was required because the department had noticed the tribes.  The notices were provided to the Cherokee tribes and the government agencies.

In addition, the mother did not provide this court with a reporter's transcript of the hearings or a suitable substitute.  The mother failed to provide transcripts of numerous hearings for I.A. including the detention, jurisdiction and disposition hearings.  A judgment is presumed to be correct and appellant has a duty to provide the reviewing court with an adequate record to demonstrate error.  These are the hearings where the Indian Child Welfare Act issues were resolved in whole or in part.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1271.)  Without a proper record, we cannot determine whether the juvenile court made findings under the Indian Child Welfare Act.  Appellate courts have consistently refused to reach the merits of an appellant's claims because no reporter's transcript or a suitable substitute of a pertinent proceeding was produced.  (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 273-274 [transfer order]; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296 [attorney fee motion hearing]; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574-575 (lead opn. of Grodin, J.) [new trial motion hearing]; *In re Kathy P.* (1979) 25 Cal.3d 91, 102 [hearing determining whether counsel was waived and minor consented to informal adjudication].)

B.  Section 366.26 Hearing Notice

At the March 14, 2013 section 366.26 hearing, the mother was represented by Ryan Matienzo.  The mother argues the juvenile court should have granted Mr. Matienzo's continuance request on March 14, 2013.  We review this contention for an abuse of discretion.  (*In re Mary B*. (2013) 218 Cal.App.4th 1474, 1481; *In re Giovanni F*. (2010) 184 Cal.App.4th 594, 604.)  Mr. Matienzo requested a continuance because the mother was not present.  The mother was present on January 18, 2013, when the juvenile court set the contested section 366.26 hearing for I.A. for March 14, 2013.  The mother was given notice of the March 14, 2013 hearing.  No abuse of discretion occurred.

The mother also contends she was not provided proper notice of the section 366.26 hearing.  An appellate court ordinarily will not consider a challenge to a ruling if an objection is not made in juvenile court.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Ricky T.* (2013) 214 Cal.App.4th 515, 522.)  Here, the mother's counsel did not raise the defective notice issue with the juvenile court to permit it to correct the mistake.  (*In re B.G.* (1974) 11 Cal.3d 679, 692; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754.)  The mother has forfeited the notice issue because she did not raise it below.

In addition, the mother challenges notice of the continued section 366.26 hearing to I.A.'s father, D.T.  She also argues the juvenile court erred in relieving D.T.'s counsel four days before the section 366.26 hearing.  She reasons this was error because D.T. was I.A.'s presumed father.  The mother lacks standing to appeal these issues.  The mother is not an aggrieved person whose rights or interest are injuriously affected by the decision in an immediate or substantial way.  (*In re K.C.* (2011) 52 Cal.4th 231, 236; *In re Desiree M.* (2010) 181 Cal.App.4th 329, 333-334.)

C.  Sibling Relationship Exception

Section 366.26, subdivision (c)(1) requires the juvenile court to terminate parental rights if the child is found likely to be adopted by clear and convincing evidence unless one of the exceptions applies.  Under the sibling relationship exception, the juvenile court must find a compelling reason that termination of parental rights would substantially interfere with a child's sibling relationship.  (§ 366.26, subdivision (c)(1)(B)(v).)  The juvenile court evaluates:  "the nature and extent of the relationship, including, but not limited to whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest . . . ."  (§366.26, subd. (c)(1)(B)(v).)  The juvenile court must compare these factors with the benefit of legal permanence through adoption if termination of parental rights substantially interferes with a sibling relationship.  (§366.26, subd. (c)(1)(B)(v); *In re Celine R.* (2003) 31 Cal.4th 45, 54; *In re Daisy D.* (2006 ) 144 Cal.App.4th 287, 293; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952-953.)

Appellate courts have adopted differing standards of review of sibling relationship issues.  Most courts apply a substantial evidence standard review.  (*In re K.P.* (2012) 203 Cal.App.4th 614, 621; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  One court has applied an abuse of discretion standard of review.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351; see *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)  One court has hypothesized that both standards of review can be combined in some fashion.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; see *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)  Under any of these standards of review, no error occurred.

The mother argues it was error to terminate her parental rights over I.A. because the sibling relationship exception applied under section 366.26, subdivision (c)(1)(B)(v).  She asserts I.A. and C.A. were placed in the same home and were "very bonded" with each other.  The mother also points to evidence I.A. loved C.A. and they were happy together.

20

The juvenile court could properly find termination of parental rights did not substantially interfere with I.A.'s relationship with C.A. The mother argues I.A. will not be able to see C.A. This is because C.A. will be placed with the paternal grandmother in Maryland. But C.A.'s placement with his paternal grandmother is separate from termination of the mother's parental rights over I.A. More importantly, the benefits of adoption by I.A.'s paternal aunt, D.L., outweighs I.A.'s sibling relationship with C.A. D.L. could no longer care for both children. I.A. is entitled to permanency. Such permanency and stability was in I.A.'s long term emotional interest. No other home was available to care for both children. No error occurred.

## D. Adoptability

Adoptability focuses on whether the child's age, physical condition and emotional state make it difficult to find a person willing to adopt the minor. (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) Our Supreme Court stated: "All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S., supra,* 31 Cal.4th at p. 406; *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.) Section 366.26, subdivision (c)(1) stresses, "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." If a child is generally adoptable, we do not assess the suitability of the prospective adoptive home. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) But if a child is adoptable based solely on the willingness of a particular family to adopt him, the court must determine whether there is a legal impediment to adoption. (*Ibid.*) A prospective adoptive parent's interest in adopting the child is evidence that the minor's age, physical condition, or mental state will not discourage others from adopting the youngster. (*In re I.W., supra,* 180 Cal.App.4th at p. 1526; *In re Erik P.* (2002) 104 Cal.App.4th 395, 400.) We review an adoptability finding for substantial evidence. (*In*

21

*re Michael G., supra,* 203 Cal.App.4th at p. 589; *In re Jose C.* (2010) 188 Cal.App.4th 147, 158.)

The mother acknowledges there is evidence I.A. will be adopted by his paternal aunt, D.L.  But the mother contends D.L.'s home study was approved with reservations. These reservations arose from D.L.'s need for future surgeries, chronic pain and use of prescription drugs.  But the department's reservations related to adoption of C.A. by D.L. The department recommended D.L. not care for any more youngsters, especially young children, because of her health problems.  The department noted I.A. was a mature and independent 10-year old whose needs were being met by D.L.  Substantial evidence supports the adoptability finding for I.A.  D.L. has cared for I.A. for two years and she expressed interest in adopting him.  In addition, D.L.'s home study had been approved by the department.  The mother fails to identify any legal impediment to D.L.'s adoption of I.A.

The mother also challenges the juvenile court's general adoptability finding for C.A.  The mother admits K.S. wanted to adopt C.A. but argues the adoption home study has not been approved.  But an approved adoption home study is not required for an adoptability finding.  Section 366.26, subdivision (c)(1) states, "The fact  that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."  (See *In re D.M.* (2012) 205 Cal.App.4th 283, 294, fn. 3.)

Substantial evidence supports the juvenile court's general adoptability finding. C.A. was a 21 month-old infant who was developing appropriately and meeting his developmental milestones.  In addition, the evidence shows K.S. was eager to adopt C.A. K.S. had a room ready for C.A. and had maintained a consistent relationship with him by calling and videoconferencing with him weekly.  Also, the Maryland Interstate Compact on the Placement of Children liaison stated the adoption home study would be quickly approved once C.A. was placed with K.S.  Thus, there was substantial evidence that C.A.'s adoption would be realized within a reasonable time.  (*In re Zeth S., supra,* 31 Cal.4th at p. 406; *In re Gregory A., supra,* 126 Cal.App.4th at p. 1562.)

## V.  DISPOSITION

The orders terminating the mother's parental rights as to I.A. and C.A. are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:



MOSK, J.



MINK, J.[*]

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23